**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **RAYMOND BLECH,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ROBERT BURPEE, DEREK DEL SIMONE, OPUVIZE TRUST & HOLDINGS LLC, WORCESTER DEVELOPMENT PROJECT III LLC, WORCESTER DEVELOPMENT PROJECT IV LLC, WORCESTER DEVELOPMENT PROJECT VII LLC, and WORCESTER DEVELOPMENT PROJECT VIII LLC,**<br><br>**Defendants.** | **Civil Action No._______________** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

The Plaintiff, Raymond Blech (hereinafter "Mr. Blech" or the "Plaintiff"), by and through his attorneys, files this Complaint and Demand for Jury Trial (hereinafter the "Complaint") against the Defendants, Robert Burpee (hereinafter "Mr. Burpee"), Derek Del Simone (hereinafter "Mr. Del Simone"), Opuvize Trust & Holdings LLC f / k / a Burpee Del Simone LLC (hereinafter "Opuvize"), Worcester Development Project III LLC (hereinafter "Project III"), Worcester Development Project IV LLC (hereinafter "Project IV"), Worcester Development Project VII LLC (hereinafter "Project VII"), and Worcester Development Project VIII LLC (hereinafter "Project VIII, and collectively with Mr. Burpee, Mr. Del Simone, Opuvize, Project III, Project IV, and Project VII, the "Defendants"), on knowledge as to their actions, and otherwise upon information and belief, as follows:

## I. INTRODUCTION AND OVERVIEW

1. The Plaintiff, Raymond Blech, respectfully submits his Complaint against the Defendants for their violations of law and the Plaintiff's injuries arising therefrom.

2. The Plaintiff's allegations, as set out herein, are asserted against the Defendants, jointly and severally, for general, consequential, special and punitive or multiple damages, together with statutory interest, costs and actual attorney's fees arising from, and resulting from, the Defendants' violations of the following:

a) federal securities fraud and violations of Section 10(b) of the Securities Exchange Act of 1934 (hereinafter the "Exchange Act") (15 U.S.C. § 78j(b)) and Rule 10b-5, as promulgated thereunder (17 C.F.R. § 240.10b-5), by the U.S. Securities Exchange Commission (hereinafter the "SEC");

b) "control person" liability and violations of Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a));

c) state securities fraud and violations of the Massachusetts Uniform Securities Act, M.G.L. c. 110A, § 410(a);

d) "control person" liability pursuant to Section 410(b) of the Uniform Securities Act, M.G.L. c. 110A, § 410(b);

e) common law fraud and deceit;

f) negligent misrepresentation;

g) unjust enrichment;

h) conversion; and/or

g) breach of contract.

3. The Plaintiff respectfully requests that (1) his causes of action against the Defendants proceed to a trial by jury, (2) that a judgment be entered on Counts I, II, III, IV, V, VI, VII, VIII, and IX against all of the Defendants, and (3) Plaintiff be awarded his general, consequential, special and punitive damages in an amount of not less than **<u>$596,169.50</u>**, together

with statutory interest, costs, and attorney's fees. The Plaintiff respectfully request that this Honorable Court grant, order, and enter such relief, and any such other relief as this Court deems just and appropriate.

## II. PARTIES

4. The Plaintiff, Raymond Blech, is a seventy-two-year-old Florida resident with an address of 2366 Haddon Hall Pl. Clearwater, Florida 33764. Mr. Blech is a retired cattle rancher and prior business owner.

5. The Defendant, Robert Burpee is a Massachusetts resident, with a last-known residential address of 95 Wheeler Street, Gloucester, Massachusetts 01930. From in or around November 2007 until in or around May 2023, Mr. Burpee was a financial consultant and manager of Opuvize and Projects III, IV, VII, and VIII.

6. The Defendant, Derek Del Simone, is a California resident, with a last known residential address of 315 Sermillon Lane, Santa Rosa, California 95403 At all relevant times, Mr. Del Simone was a financial consultant and manager for Opuvize and Projects III, IV, VII, and VIII. Until recently, and at relevant times, Mr. Del Simone resided in Massachusetts.

7. The Defendant, Opuvize Trust & Holdings LLC f/k/a Burpee Del Simone LLC, is a Massachusetts limited liability company that was organized on September 28, 2015. It has a principal place of business at 75 Arlington Street, 5th Floor, Boston, Massachusetts 02116. Mr. Burpee and Mr. Del Simone were both listed as Managers of Opuvize on annual reports through 2022, and thereafter Mr. Del Simone is listed as sole Manager. Opuvize is the parent company of Projects III, IV, VII, and VIII, with which it shares Managers, a business address, and upon information and belief, over which it exerts substantial control.

8. The Defendant, Worcester Development Project III LLC, is a Massachusetts limited liability company. It was organized on January 24, 2019 and has a principal place of business at 75 Arlington Street, 5th Floor, Boston, Massachusetts 02116. Mr. Burpee and Mr. Del Simone were both listed as Managers of the business on annual reports through 2022, and thereafter Mr. Del Simone is listed as the sole Manager.

9. The Defendant, Worcester Development Project IV LLC, is a Massachusetts limited liability company. It was organized on April 17, 2019 and has a principal place of business at 75 Arlington Street, 5th Floor, Boston, Massachusetts 02116. Mr. Burpee and Mr. Del Simone were both listed as Managers of the business on annual reports through 2022, and thereafter Mr. Del Simone is listed as the sole Manager.

10. The Defendant, Worcester Development Project VII LLC, is a Massachusetts limited liability company. It was organized on June 8, 2020 and has a principal place of business at 75 Arlington Street, 5th Floor, Boston, Massachusetts 02116. Mr. Burpee and Mr. Del Simone were both listed as Managers of the business on annual reports through 2022, and thereafter Mr. Del Simone is listed as the sole Manager.

11. The Defendant, Worcester Development Project VIII LLC, is a Massachusetts limited liability company. It was organized on October 21, 2020 and has a principal place of business at 75 Arlington Street, 5th Floor, Boston, Massachusetts 02116. Mr. Burpee and Mr. Del Simone were both listed as Managers of the business on annual reports through 2022. Since 2023, Mr. Del Simone is listed as the sole Manager.

## III. ALTER EGOS AND COMMON ENTERPRISE

12. Defendants have operated as a common enterprise while engaging in the illegal acts and practices alleged in the Complaint. Defendants Robert Burpee and Derek Del Simone

conducted the alleged deceptive practices described herein by and through an interrelated network of their financial advisory company, Opuvize Trust & Holdings LLC f/k/a Burpee Del Simone LLC, along with Worcester Development Project III, Worcester Development Project IV, Worcester Development Project VII, and Worcester Development Project VIII, which share business functions, senior executives and management, a principal place of business, and a registered agents; and are an were, during the relevant time, commonly controlled by Defendants Burpee and Del Simone. Defendants utilized Opuvize's brand recognition and the trust it had already garnered from the financial advisory community, then created four (4) separate limited liability companies in order to distance themselves and Opuvize from the consequences of their unlawful activities. Because the corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Additionally, there is a unity of interest between the corporate Defendants and the individual Defendants in such that they are alter egos. Mr. Burpee and Mr. Del Simone personally made representations and omissions of material fact to the Plaintiff, with actual or apparent authority over Projects III, IV, VII, and VIII. The Plaintiff asserts that a failure to recognize the corporate forms of the corporate Defendants would sanction and fraud and injustice by shielding and safeguarding them from liability for their roles in a deceptive scheme that has caused nearly a million dollars in damages and injury to the Plaintiff, and would unjustly enrich them by permitting them to keep such monies.

## IV. JURISDICTION AND VENUE

13. Plaintiff asserts that this Honorable Court has jurisdiction over this action under 28 U.S.C. § 1331, as this case arises under the laws of the United States. Specifically, this case arises under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). Additionally, this Honorable Court has pendent jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14. Furthermore, Plaintiff contends that diversity jurisdiction exists over this matter pursuant to 28 U.S.C. § 1332, as the Plaintiff resides in Florida, Mr. Del Simone resides in California, Mr. Burpee resides in Massachusetts, every corporate Defendant is incorporated under the laws of Massachusetts, and the amount in controversy exceeds $75,000.00.

15. This Court has personal jurisdiction over Mr. Burpee as a Massachusetts resident and over each corporate Defendant because they are organized under the laws of Massachusetts. This court has personal jurisdiction over Mr. Del Simone because his role as manager of Opuvize and Projects III, IV, VII, and VIII and his extensive business activities arising therefrom give him sufficient minimum contacts with the forum state.

16. Venue is proper in this Court under 28 U.S.C. § 1391 (b)(2) because all Defendants reside in, or have resided in, or have been organized in the Commonwealth of Massachusetts and substantial events giving rise to the causes of action occurred here.

## V. FACTS AND BACKGROUND

### A. Mr. Blech Invests with Opuvize Subsidiaries

17. Mr. Blech first met Mr. Burpee in or about 2012, when the Plaintiff considered Opuvize as a stock brokerage for securities held in Mr. Blech's father's estate. Although he eventually went with another broker, Mr. Blech reunited with Mr. Burpee the following year when the Plaintiff requested assistance with investing some of his fourteen million dollar ($14,000,000.00) inheritance in the stock market.

18. Over approximately the next seven (7) years, Mr. Burpee gained Mr. Blech's trust through their investment relationship and represented himself as a person with the experience, knowledge, and ability to identify and manage profitable investments.

**i. Project III Initial Investment**

19. In or around 2019, Mr. Burpee, individually and through his company Opuvize, solicited Mr. Blech to invest in real estate projects owned by Opuvize subsidiaries. One such subsidiary, Worcester Development Project III LLC, was raising two million dollars ($2,000,00.00) by selling units of ownership for one dollar ($1) each, with the stated goal of purchasing, renovating, renting, and eventually selling three (3) to five (5) multifamily properties in Worcester, Massachusetts.

20. As a prospective investor, Mr. Blech was presented with documentation outlining the investment, including a confidential private offering memorandum (hereinafter the "Project III Offering Memorandum") which included a summary of the offering, purchaser requirements, projects, risk factors, among other information. A true and accurate copy of the Project III Offering Memorandum is attached hereto as **Exhibit 1.**

21. Mr. Blech was also provided with a Subscription Agreement for Project III which described the relationship between the parties and required Mr. Blech to verify his readiness to commit as an investor. A true and accurate copy of the Project III Subscription Agreement is attached hereto as **Exhibit 2**.

22. An executive summary for Project III was attached as an exhibit to the Project III Offering Memorandum, and included a magazine article about recent development in Worcester, Massachusetts, a list of potential target properties, key features and investment projections, and magazine article about a triple-A baseball team moving to Worcester. *See* **Exhibit 1**, *Ex. A.,* 1-11.

23. Importantly, the executive summary stated that investors would receive quarterly returns equivalent to an eight percent (8%) annual distribution rate on their initial investment. *See*

**Exhibit 1**, *Ex. A*, p. 3. For example, if an investor were to invest $100,000, then they would receive $8,000 annually in returns, paid out to them once per quarter. These returns would begin being paid out thirty (30) to sixty (60) days after all capital for Project III was raised. *See id.* Mr. Burpee represented to Mr. Blech that the returns would come from rental income at the properties.

24. Additionally, investors would receive a final distribution after all of the properties owned by Project III sold, which was expected to occur around five (5) years after their initial investment. **Exhibit 1**, *Ex. A*, p. 3. This distribution was projected to be higher than their original investment to reflect the increase in value of the properties sold. *See id.*, p. 4.

25. Mr. Blech invested $192,000 into Project III based on the information in the executive summary, Mr. Burpee's representations, and his history with Mr. Burpee as a trusted financial advisor. A true and accurate copy of the direct transfer from Mr. Blech's redacted interactive broker's account showing this transfer is attached hereto as **Exhibit 3**.

26. At the time that Mr. Burpee provided the Project III subscription agreement and offering memorandum, Mr. Burpee knew that the representations concerning the promised returns, the anticipated disposition of the projects, and/or the ability to return Mr. Blech's invested capital were false and misleading, or Mr. Burpee made those representations with reckless disregard for whether they were true and without a present intent to perform them.

**ii. Project IV Initial Investment**

27. Shortly thereafter, in or around May 2019, Mr. Burpee approached Mr. Blech to invest in yet another Opuvize project, Project IV. Mr. Blech was provided with an offering memorandum. The Project IV investment was materially similar to the Project III investment and represented that Mr. Blech's money would be invested in the new real estate project, which he

would receive eight percent (8%) annual returns upon. A true and accurate copy of the Project IV offering memorandum is attached hereto as **Exhibit 4**.

28. Mr. Blech invested $545,000.00 into Project IV on or around May 20, 2019, split between two transfers, both directly from his Interactive Brokers account. A true and accurate redacted copy of the transfers are attached hereto as **Exhibit 5**.

**iii. Project VII Initial Investment**

29. The following year, in or around November 2020, Mr. Burpee approached Mr. Blech once again for another investment, this time for Project VII. Mr. Burpee received a subscription agreement that was materially similar to the subscription agreements for Projects III and VI, except that shares equated to a lower ownership percentage. A true and accurate copy of the Project VII subscription agreement is attached hereto as **Exhibit 6**.

30. Mr. Blech invested $378,500.00 into Project VII on November 20, 2020 via personal check made payable to Worcester Development Project VII LLC. A true and accurate redacted copy of the check is attached hereto as **Exhibit 7**.

**iii. Project VIII Initial Investment**

31. Immediately thereafter, Mr. Blech received a private offering memorandum for Project VIII, which was materially similar in all respects to the prior projects. A true and accurate copy of the private offering memorandum for Project VIII is attached hereto as **Exhibit 8**.

32. Mr. Blech made his largest investment yet, $600,000.00, into Project VIII on December 4, 2020 by personal check made out to Worcester Development Project VIII. A true and accurate copy of the redacted check is attached hereto as **Exhibit 9**.

33. Mr. Blech's receipt and acknowledgement of the subscription agreements, offering memorandums, and attached executive summaries for the projects, his conversations with Mr.

Burpee, and Mr. Blech's subsequent payments effectuated a contract between Mr. Blech and Project III, Project IV, Project VII, and Project VIII.

34. Mr. Burpee acquainted Mr. Blech with his business partner, Mr. Del Simone throughout this period. Residing in Florida, Mr. Blech has not met Mr. Del Simone in person because both Mr. Burpee and Mr. Del Simone lived in Massachusetts throughout the relevant period. However, Mr. Blech and Mr. Del Simone have exchanged several emails, and at all relevant times, the Plaintiff understood that Mr. Del Simone was an integral part of the investment projects.

35. At the time each of the foregoing investments was solicited and made, the Defendants represented that the Plaintiff's funds would be used for the stated real estate projects, that the projects would generate the represented returns, and that his principal would ultimately be returned through project distributions, refinancing, or sale of the underlying properties to Mr. Blech.

36. Because Mr. Blech would not have invested the amounts described above had he known that the projects would not perform as represented, that the promised returns would not be paid, that his principal would not be timely returned, or that material information concerning the projects and the use of his funds had been withheld.

37. The subsequent conduct of Mr. Burpee and Mr. Del Simone, and the entities they controlled confirms that the representations concerning the projects and their expected returns were not made in good faith and that, when the investments were solicited, Mr. Burpee and Mr. Del Simone either knew the representations were false or misleading, omitted material facts, or lacked the present intent to perform the promises upon which Mr. Blech relied.

38. Approximately one (1) year after soliciting investments for each project and using those investments to pay for the investment properties outright, the Projects each took out

mortgages on their properties valued between $843,000.00 and $1,000,000.00. Upon information and belief, investors were never updated on this development nor is there any obvious explanation for why this occurred.

39. Additionally, local tax liens were levied against at least four (4) of the properties, at 117 Burncoat Street, Worcester, Massachusetts 01605; 2 Perkins Street, Worcester, Massachusetts 01605; 31 Olga Avenue, Worcester, Massachusetts 01605; and 15 Genessee Street, Worcester, Massachusetts 01603. Upon information and belief, investors also were never updated on this development nor is there any obvious explanation for why this occurred.

## B. Mr. Blech Grows Concerned and Opuvize Becomes Evasive

40. On or about May 19, 2023, approximately three (3) years after the initial investments, Mr. Burpee and Mr. Del Simone sent a letter to their investors announcing Mr. Burpee's retirement from Opuvize and its subsidiaries, which upon information and belief include Projects III, IV, VII, and VIII. A true and accurate copy of the retirement letter is attached hereto as **Exhibit 10**.

41. However, Mr. Burpee remained in an advisory role with the companies for an extended period after the retirement announcement and continued to have knowledge concerning the projects and their financial affairs.

42. On or about February 11, 2025, Mr. Del Simone emailed Mr. Blech with the following update on Projects III, IV, VII, and VIII:

> "Worcester Development Project III: Owns one final property that is in contract to be sold, the closing date for the property transaction is 2/28/25. The next step will be final accounting and settlement of any outstanding obligations, after which I will be able to provide investment return information. You will have the choice to receive your funds back or reinvest part or all into a new real estate investment. The target date for the return of capital or final distribution is the next scheduled distribution date of April 15th [2025].

> Worcester Development Project IV: Currently owns three properties, one property is in contract to be sold with a closing date of 2/12/25. We are actively working on selling the other two properties. I expect to have all properties sold in the next sixty to ninety days which would put the final accounting and program closure around May / June of this year.
>
> Worcester Development Project VII: Currently owns three properties, one property is in contract to be sold with a closing date of 2/12/25. We are actively working on selling the other two properties. I expect to have all properties sold in the next sixty to ninety days which would put the final accounting and program closure around May / June of this year.
>
> Worcester Development Project VIII: Currently owns two properties that are both in contract to be sold with a closing date of 2/28/25. The next step will be final accounting and settlement of any outstanding obligations, after which I will be able to provide investment return information. You will have the choice to receive your funds back or reinvest part or all into a new real estate investment. The target date for the return of capital or final distribution is the next scheduled distribution date of April 15th [2025]."

A true and accurate copy of the February 11, 2025 email is attached hereto as **Exhibit 11**.

43. Mr. Blech did not receive either distribution promised by the February 11, 2025 email for Project III or Project VIII on or around April 15, 2025. Additionally, he was not updated as to whether the closings had occurred and whether he could expect distributions from those projects as well.

44. Concerned about the lack of information he was receiving, on May 26, 2025, Mr. Blech emailed Mr. Del Simone and requested an update for how the projects were performing. A true and accurate copy of the May 26, 2025 email is attached hereto as **Exhibit 12**.

45. On or about June 2, 2025, Mr. Blech emailed Mr. Del Simone and stated that he had decided not to invest any investments portion into a new project and that instead he wished to forward all investment funds to his Ameriprise account. Mr. Del Simone acknowledged Mr. Blech's email three (3) days later on June 5, 2025, and stated that all final distributions would be

made to Mr. Blech's Ameriprise account. A true and accurate copy of both the June 2, 2025 email and June 5, 2025 response are attached hereto as **Exhibit 13**.

46. On or about June 18, 2025, Mr. Blech reminded Mr. Del Simone of his request and asked again for refunds on any completed projects. When Mr. Del Simone did not respond, Mr. Blech followed up seven (7) days later, but again received no response. A true and accurate copy of both the June 18, 2025 and June 56, 2025 emails are attached hereto as **Exhibit 14**.

47. In or around July 2025, Mr. Blech stopped receiving eight percent (8%) distributions from Projects III, IV, VII, and VIII, which up until that point he had been receiving quarterly. It was his understanding that he would continue receiving these amounts until his final distributions were paid out.

48. On or about July 29, 2025, Mr. Blech emailed Mr. Del Simone requesting information on the purchase prices and appraiser's values for Projects III, IV, VII, and VIII so that he could understand why he was no longer receiving quarterly installments of his returns. A true and accurate copy of the July 29, 2025 email is attached hereto as **Exhibit 15**.

49. Mr. Blech received "final distributions" for Projects III, IV, and VIII between October 1, 2025 and February 2, 2026. A true and accurate copy of the redacted checks for these distributions are attached hereto as **Exhibit 16**. However, these distributions were less than Mr. Blech's initial investments, and significantly less than what he should be owed if the investments were profitable, which they were.

50. On or about December 4, 2025, Mr. Blech reached out to Mr. Del Simone about not receiving his eight percent (8%) return. Specifically, he asked, "Shouldn't I be earning 8% on my Projects investment paid quarterly?" followed by calculations showing what he was owed. Mr. Del Simone responded the following day "[t]he revenue and expenses for both WDPIV and

WDPVII businesses will be reflected in the final distribution." A true and accurate copy of the December 4 and 5 emails are attached hereto as **Exhibit 17**.

51. Additionally, on or about December 4, 2025, Mr. Blech asked Mr. Del Simone whether he had been collecting rents since Projects IV and VII since July 2025, to which Mr. Del Simone responded that he was. A true and accurate copy of the December 4, 2025 distribution email is attached hereto as **Exhibit 18**.

52. On or about February 5, 2026, Mr. Blech accused Mr. Del Simone of shorting him by over $500,000.00, which Mr. Del Simone denied by sending a small table showing that once "pending distributions are paid." A true and accurate copy of the February 5, 2026 email and response are attached hereto as **Exhibit 19**. The "pending distributions" that Mr. Del Simone mentioned in his email have never been paid to the present date.

53. On or about March 4, 2026, Mr. Blech emailed Mr. Del Simone asking for updates on his distributions, stating that he had not heard from him in over one (1) month. A true and accurate copy of the March 4, 2026 email is attached hereto as **Exhibit 20**.

54. Mr. Del Simone responded on March 10, 2026 that "the books and taxes are being worked on, once completed, we will be able to distribute the final WDPIV distribution. We are also working on selling the final property for WDPVII." A true and accurate copy of the March 10, 2026 email is attached hereto as **Exhibit 21**. Mr. Blech still has not received the final WDPIV distribution as promised even though the properties have been sold.

55. On or about March 31, 2025 Mr. Blech called out Mr. Del Simone for his evasive emails and requested that Mr. Del Simone specifically respond to concerns regarding the final distributions. Mr. Blech received no response. A true and accurate copy of the March 31, 2025 email is attached hereto as **Exhibit 22**.

56. On or about April 6, 2026 Mr. Blech wrote to Mr. Del Simone:

> "Project IV and VII. I don't know why you have quit responding to my communications. It has been 'with book keeping' for a month longer and without further update I am concerned the 'Final Distributions' have stopped entirely. Your phone has blocked me. You are not responding to my emails giving an update. I cannot reach you in the normal course of business. How much longer do you expect me to wait for the return of my investments and do nothing?"

A true and accurate copy of the April 6, 2026 email is attached hereto as **Exhibit 23**.

57. Mr. Blech continued emailing Mr. Del Simone requesting updates between March 4, 2026 and June 25, 2026 to which Mr. Del Simone never responded substantively and only restated that he would get back to him later or had not been in the office. A true and accurate copy of these emails are attached hereto as **Exhibit 24**.

58. Mr. Del Simone finally emailed Mr. Blech on or about September 16, 2026 with copies of his 2025 Schedule K-1s for Projects III, IV, VII, and VIII, which Mr. Blech had been requesting for several months. A true and accurate copy of that email and the K-1s that were attached are attached hereto as **Exhibit 25**. That was their last correspondence.

59. At this point, all properties held by Projects III, IV, and VIII have been sold.

60. Upon information and belief, Mr. Blech did not receive the distributions owed because they were fraudulently concealed and withheld by the Projects, Opuvize, Mr. Del Simone, and Mr. Burpee, who had made material misrepresentations and omissions of material facts with respect to the initial investments and never intended to pay out the full value of what was owed.

61. The foregoing conduct is consistent with a continuing course of conduct in which Defendants solicited and retained Mr. Blech's investment funds based upon misrepresentations and omissions concerning specified investments and returns, failed to provide material information concerning the investments when requested, failed to make promised distributions, and repeatedly misrepresented that distributions would be made when they were not.

**C. Mr. Blech Suffers Severe Damages due to Defendants' Fraud**

**i. Damages from Project III**

62. Mr. Blech's initial investment in Project III was $192,000.00, entitling him to 192,000 shares in the project ($192,000.00 / $1.00 per share = 192,000 shares). This made him a 9.6% owner in the project (192,000 shares / 2,000,000 total shares = 0.096 or 9.6%).

63. Project III owned five (5) properties, including: 18 Upsala Street, Worcester, Massachusetts 01610; 29 Acton Street, Worcester, Massachusetts 01604; 152 Dewey Street, Worcester, Massachusetts 01610; 1025 Main Street, Worcester, Massachusetts 01603; and 104 Southgate Street, Worcester, Massachusetts 01603.

64. The amount that Project III sold each property for is as follows:

- $655,000.00 for 18 Upsala St. on March 28, 2025;
- $610,000.00 for 29 Acton St. on June 17, 2024;
- $589,000.00 for 152 Dewey St. on November 10, 2022;
- $530,000.00 for 1025 Main St. on September 26, 2024; and
- $565,000.00 for 104 Southgate St. on April 23, 2024

A true and accurate copy of the deeds reflecting these amounts is available as **Exhibit 26**.

65. Pursuant to his 9.6% ownership interest in Project III, Mr. Blech was entitled to $283,104.00 from the sale of these properties (($655,000 + $610,000 + $589,000 + $530,000 + $565,000) x 0.096 = $283,104.00).

66. On October 15, 2025, Mr. Blech received a disbursement of $121,153.29 from Project III which was characterized as a "final distribution". On October 16, 2025, Mr. Blech received an additional disbursement of $45,212.27 as a part of the "final distribution".

67. After crediting those two (2) distributions against the $283,104.00 that Mr. Blech was owed from the sale of the Project III properties, $116,738.44 remains unpaid.

68. Additionally, pursuant to the parties' agreement, Mr. Blech was entitled to an eight percent (8%) annual return on his investment until he received his final distributions.

69. Based upon Mr. Blech's initial investment of $192,000.00, the contractual return would be $1,280.00 ($192,000 x 8% ÷ 12) per month[1]. Mr. Blech received the agreed return on his investment through in or about June 2025.

70. Beginning in or around July 2025, the Defendant refused and failed to continue payments, without explanation. Mr. Blech was entitled to these returns until he received his final distribution, which did not occur until in or around October 2025, meaning that Mr. Blech is owed returns from July – September 2025.

71. From July 2025 through September 2025, three (3) months of contractual returns accrued at $1,280 per month, for a total of $3,840.00, which should have been paid to Mr. Blech.

72. Therefore, the total amount that Mr. Blech is owed on Project III is $120,578.44, consisting of $116,738.44 in unpaid principal and $3,840.00 in accrued contractual return.

**ii. Damages from Project IV**

73. Mr. Blech's initial investment in Project IV was $545,000.00, entitling him to 545,000 shares in the project ($545,000.00 / $1 per share = 545,000 shares). This made him a 27.25% owner in the project (545,000 shares / 2,000,000 total shares = 0.2725 or 27.25%).

74. Project IV owned four (4) properties, including: 52 Cedar Street, Worcester, Massachusetts 01609; 8 West Street, Worcester, Massachusetts 01609; 1 Edgewood Street, Worcester, Massachusetts 01602; and 27 Lyon Street, Worcester, Massachusetts 01604.

75. The amount that Project IV sold each property for is as follows:

- $620,000.00 for 52 Cedar St. on September 4, 2025;
- $765,000.00 for 8 West St. on March 3, 2025;

[1] Although the returns were distributed quarterly, they are calculated monthly here in order to allege a more accurate damages total as of the date hereof.

- $500,000.00 for 1 Edgewood St. on June 30, 2023; and
- $530,000.00 for 27 Lyon St. on December 31, 2025

A true and accurate copy of the deeds reflecting these amounts is available as **Exhibit 27**.

76. Pursuant to his 27.25% ownership interest in Project IV, Mr. Blech was entitled to $658,087.50 from the sale of these properties (($620,000 + $765,000 + $500,000 + $530,000) x 0.2725 = $658,087.50).

77. On or about February 2, 2026, Mr. Blech received a distribution of $284,831.14, which Mr. D characterized as a "final distribution" for Project IV.

78. After crediting that distribution against the $658,087.50 that Mr. Blech was owed from the sale of the Project IV properties, $400,256.36 remains unpaid.

79. Additionally, pursuant to the Parties' agreement, Mr. Blech was entitled to an eight percent (8%) annual return on his investment until he received his final distributions.

80. Based on Mr. Blech's initial investment of $545,000.00, the contractual return for one month would be $3,633.33 ($545,000.00 x 8% ÷ 12). Mr. Blech received the agreed return on his investment until in or about June 2025.

81. Beginning in or about July 2025, the Defendants refused and failed to continue payments, without explanation. Mr. Blech was entitled to these returns until he received his final distribution, which did not occur until February 2025, meaning that Mr. Blech is owed returns from July 2025 through January 2026.

82. From July 2025 through January 2026, seven (7) months of contractual return accrued at $3,633.33 per month, for $25,433.31 total, which should have been paid to Mr. Belch.

83. Therefore, as October 2026, the total amount due on Project IV is $425,689.67, consisting of $400,256.36 in unpaid principal and $25,433.31 in accrued return.

**iii. Damages from Project VII**

84. Mr. Blech's initial investment in Project VII was $378,500.00, entitled him to 378,500 shares in the project ($378,000.00 / $1.00 per share = 378,500 shares). This made him a 9.46% owner in the project[2].

85. Project VII owned four (4) properties, including: 65 Russell Street, Worcester, Massachusetts 01609; 15 Genessee Street, Worcester, Massachusetts 01603; 31 Olga Avenue, Worcester, Massachusetts 01605; and 210 Ingleside Avenue, Worcester, Massachusetts 01604.

86. Project VII still owns the property at 15 Genessee Street, Worcester, Massachusetts 01603 and therefore no final distributions have been paid or are presently due.

87. However, pursuant to the Parties' agreement, Mr. Blech was entitled to an eight percent (8%) annual return on his investment until he receives his final distributions.

88. Based upon Mr. Mr. Blech's initial investment of $378,500.00, the contractual return would be $2,523.33 ($378,500 x 8% ÷ 12) per month. Mr. Blech received the agreed return on his investment through in or about June 2025.

89. Beginning in or about July 2025, however, the distributions to Mr. Blech ceased. Mr. Blech is entitled to these returns until he receives his final distribution, meaning that he is owed returns from July 2025 – September 2026.

90. From in or about July 2025 through October 2026, sixteen (16) months of contractual return accrued at <u>$2,523.33</u> per month, for a total of <u>$40,373.28</u>.

91. Therefore, as of October 2026, the total amount due on Project VII is <u>$40,373.28</u>.

---

[2] Calculations reflect offering details on the Project VII Subscription Agreement, Ex. 6 at p. 1.

iv. **Damages from Project VIII**

92. Mr. Blech's original investment in Project VIII was $600,000.00, entitling him to 600,000 shares in the project ($600,000.00 / $1.00 per share = 600,000 shares). This made Mr. Blech a 15% owner in the project[3].

93. Project VIII owned five (5) properties, including: 55 Richard Street, Worcester, Massachusetts 01603; 2 Perkins Street, Worcester, Massachusetts 01605; 40 Circuit Avenue East, Worcester, Massachusetts 01603; 117 Burncoat Street, Worcester, Massachusetts 01605; and 13 Saint Elmo Road, Worcester, Massachusetts 01602.

94. The amount that Project III sold each property for is as follows:

- $485,000.00 for 55 Richard St. on September 6, 2023;
- $625,000.00 for 2 Perkins St. on March 10, 2025;
- $520,000.00 for 40 Circuit Ave. E. on July 19, 2024;
- $535,000.00 for 117 Burncoat St. on March 7, 2025; and
- $460,000.00 for 13 Saint Elmo Rd. on October 3, 2023.

A true and accurate copy of the deeds reflecting these amounts is available as **Exhibit 28**.

95. Pursuant to his 15% ownership interest in Project VIII, Mr. Blech was entitled to $393,750 from the sale of these properties (($485,000.00 + $625,000.00 + $520,000.00 + $535,000.00 + $460,000.00) x 0.15 = $393,750.00).

96. Additionally, pursuant to the Parties' agreement, Mr. Blech was entitled to an eight percent (8%) annual return on his investment until he received his final distributions.

97. Based upon Mr. Blech's initial investment of $600,000.00, the contractual return would be $4,000 ($600,000 x 8% ÷ 12) per month. Mr. Blech received the agreed return on his investment through in or around June 2025.

[3] Calculations reflect offering details on the Project VII Subscription Agreement, Ex. 6 at p. 1.

98. Beginning in or around July 2025, the Defendants refused and failed to continue payments, without explanation. Mr. Blech was entitled to these returns until he received his final distribution, which did not occur until in or about October 2025, meaning that Mr. Blech is owed returns from July through September 2025.

99. From July 2025 through September 2025, three (3) months of contractual return accrued at $4,000.00 per month, for a total of $12,000.00.

100. On or about October 1, 2025, Mr. Blech received a distribution of $396,221.89, which was characterized as a "final distribution."

101. Therefore, as of October 2026, the total amount due on Project VIII is $9,528.11, consisting of the $405,750.00 owed ($393,750 in unpaid principal and $12,000.00 in accrued return) minus $396,221.89 in final distribution.

102. As a result of Defendants' material misrepresentations and omissions in connection with the sale of securities, the Plaintiff has suffered damages of at least **$596,169.50** across Projects III, IV, VII, and VIII, as well as general, special and consequential damages, as a result of the Defendants' fraudulent scheme.

**D. Worcester Projects and Derek Del Simone Face Other Litigation**

103. On or about August 19, 2026, Alan Brennan (hereinafter "Mr. Brennan"), a former manager and shareholder of Projects III, IV, VII, and VIII, filed claims for breach of fiduciary duty, breach of contract, declaratory judgment, accounting, and a request for injunctive relief against Mr. Del Simone, Opuvize, and Worcester Development Projects I-VIII. *See Brennan v. Del Simone et al., Case No. 2685CV012773, Dkt. No. 1 (Worcester Sup. Ct.)*.

104. The Brennan Complaint alleges that the Worcester projects became successful and that, shortly thereafter, Mr. Burpee and Mr. Del Simone phased him out of his management role

and then fraudulently withheld the portion of the sales for the properties for which he was entitled. *See Brennan Complaint,* ¶¶ 12, 17, 21-22. A true and accurate copy of the Brennan Complaint is available hereto as **Exhibit 29**.

105. The Brennan Complaint further alleges Mr. Del Simone has not responded to Mr. Brennan's repeated requests for accounting in order to understand why he is receiving distributions that are lower than expected. *See Brennan Complaint,* ¶¶ 27-30.

106. The Complaint filed by Alan Brennan and the factual assertions therein provide further support for Mr. Blech's claims that Mr. Del Simone, Mr. Burpee, Opuvize, and Projects III, IV, VII, and VIII are withholding distributions that are rightly owed to Mr. Blech, that they are engaging in a fraud against him, and that they are acting in concert to do so.

107. As a direct and proximate cause of Defendants' wrongful and violative acts, Plaintiff has suffered, and continue to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to his detriment.

## VI. VIOLATIONS OF LAW

### COUNT I – FEDERAL SECURITIES FRAUD IN CONNECTION WITH THE OFFER, PURCHASE AND/OR SALE OF SECURITIES IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT (15 U.S.C. § 78(j)(b)) AND RULE 10b-5 PROMULGATED THEREUNDER

108. The Plaintiff realleges Paragraphs 1 – 107, with **Exhibits**, and incorporates them herein by reference.

109. In or about 2019 and 2020, the Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, as described herein, in connection with the purchase, offer and sale of securities. Specifically, the

Defendants knowingly, recklessly and intentionally employed a predatory scheme upon Mr. Blech which defrauded him of over half of a million dollars.

110. 15 U.S.C. § 78(j)(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security…any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

111. Under 17 C.F.R. §240.10b-5, "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any devise, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

112. At such times material to this Complaint, in connection with offer, purchase and/or sale of securities in the Projects III, IV, VII, and VIII, the Defendants knowingly, intentionally and/or recklessly, and with scienter, engaged in the aforementioned fraudulent scheme and artifice to defraud the Plaintiff as to Projects III, IV, VII, and VIII, and made statements, omitted to make material statements while having a duty to disclose the same, or engaged in fraudulent and deceptive practices or courses of business, to cause the Plaintiff to detrimentally rely upon the same.

113. Specifically, Defendants violated 15 U.S.C. §78j(b) by and through 17 C.F.R. §240.10b-5 in the following ways:

- Defendants fraudulently induced Plaintiff to invest his money in Projects III, IV, VII, and VIII, promising he would receive annual

distributions of eight percent (8%) and a greater return on his initial investment, which they later purposefully failed to deliver upon;

- Defendants ceased making the eight percent (8%) returns payments to Mr. Blech in or around July 2025, without explanation despite the fact that he had not received full final distributions on the properties;

- Defendants made final distributions to the Plaintiff later than promised even when two (2) of the projects allegedly wrapped up months before and distributions were supposed to be made promptly thereafter; and,

- Defendants shorted Plaintiff in his final distributions without explanation and cut off contact with Plaintiff when he challenged the amounts.

114. Defendants did not intend to deliver Plaintiff the full value of his investment and instead merely orchestrated the projects to elicit project funds without the real intention to distribute these funds. This is supported by the carelessness and lack of specificity in the executive summaries provided to Mr. Blech, together with the fact that an investment agreement was never formally executed between the parties for any of these projects.

115. Defendants, knowing that Mr. Blech had recently come into a large inheritance, exploited Mr. Burpee's position as Mr. Blech's financial advisor and engaged in a coordinated scheme which cultivated in defrauding Mr. Blech of over half a million dollars.

116. As a direct and proximate cause of the violations of the federal securities laws by the Defendants, Plaintiff has suffered, and continue to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to his detriment, which resulted in the unfair enrichment of the Defendants.

**COUNT II – "CONTROL PERSON" LIABILITY PURSUANT TO SECTION 20(a) OF THE EXCHANGE ACT - 15 U.S.C. § 78t(a)**

117. The Plaintiff realleges Paragraphs 1 – 116, with **Exhibits**, and incorporates them herein by reference.

118. During the relevant time period and as set forth herein, the Defendants are, and were during the relevant time, "control persons" within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

119. In addition to their direct liability, the Defendants are liable to the Plaintiff for the conduct of their agents and subsidiaries Projects III, IV, VII, and VIII, as described herein, in that:

a) at all times material hereto, Defendants controlled Projects III, IV, VII, and VIII, which were subject to their authority, supervision and/or control, respectively, directly or indirectly; and,

b) at all times material hereto and with respect to all of the transactions and misrepresentations described herein, Projects III, IV, VII, and VIII, subject to the authority, supervision and/or control of Defendants, their agents and subsidiaries, who committed acts, practices and/or courses of conduct in violation of their obligations under the federal securities laws and the standards of the securities industry.

120. The Defendants, jointly and severally, singly and in concert, directly and/or indirectly, benefitted from fees, profits, gains, interest, commissions and/or other monies, as derived from the conduct of such individual(s), as described herein.

121. As "control persons," the Defendants are liable for the false and fraudulent actions, practices, courses of conduct and/or omissions of those controlled persons committing a fraud and deceit in connection with the offer, purchase and/or sale of Projects III, IV, VII, and VIII securities, at the time of the wrongs alleged herein and as set forth herein, within the meaning of Section 20(a) of the Exchange Act, as the Defendants had the supervision, power, authority, and influence over such controlled persons, and exercised the same as described herein.

122. The Defendants' control, authority, supervision and/or positions made them privy to and provided them with knowledge, actual and/or apparent, as to the material misrepresentations and the omissions of material facts, with a duty to disclose, as to the Plaintiff.

123. The Defendants willfully, knowingly, intentionally and recklessly, and with scienter, engaged in the aforementioned The Worcester Projects scheme and artifice, made the aforementioned statements, omitted to make necessary material statements, or engaged in fraudulent and deceptive practices or courses of business.

124. The Defendants each had the power and authority to influence and control the content and dissemination of false and misleading statements made to the Plaintiff in order to prevent the dissemination of such false and misleading statements or to cause them to be corrected.

125. The Defendants each had the power and authority to influence and control the content and dissemination of false and misleading statements made by each other to the Plaintiff in order to prevent the dissemination of such false and misleading statements or to cause them to be corrected.

126. By virtue of their status as control persons, the Defendants are liable for damages suffered by the Plaintiff as a direct and proximate result of wrongful conduct by the Defendants and by Projects III, IV, VII, and VIII as alleged herein.

127. As a direct and proximate cause of the violations of the federal securities laws by the Defendants, Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to their detriment, and resulted in the unjust enrichment of the Defendants.

**COUNT III –STATE SECURITIES FRAUD**
**IN VIOLATION OF M.G.L. c. 110A, § 410(a)**

128. The Plaintiff realleges Paragraphs 1 – 127, with **Exhibits**, and incorporates them herein by reference.

129. The Defendants violated the Massachusetts Uniform Securities Act, Massachusetts General Laws Chapter 110A, §§ 101, *et seq., as amended*, in that, as described herein, they offered and sold securities by means of untrue statements of material fact.

130. Massachusetts General Laws, Chapter 110A, Section 410(a) provides, in pertinent part, as follows:

> "Any person who
>
> (1) offers or sells a security in violation of section 201(a), 301, or 405(b), or of any rule or order under section 403 which requires the affirmative approval of sales literature before it is used, or of any condition imposed under section 303(d), or
>
> (2) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him…"

M.G.L. c.110A, § 410(a).

131. The Plaintiff's investments in Projects III, IV, VII, and VIII constituted the purchase of "securities" as defined by M.G.L. c. 110A, § 401.

132. The Defendants violated the Uniform Securities Act, in that they knowingly, recklessly and intentionally, made untrue statements of material fact, and/or omissions of material fact to induce Mr. Blech into investing into Projects III, IV, VII, and VIII only to later deliberately defraud him of the benefit of those investments.

133. Such material misrepresentations and omissions of material fact, with a duty to disclose, in Projects III, IV, VII, and VIII and the Defendants' documents and statements included, but were not limited to:

(a) Stating that Plaintiff would receive eight percent (8%) annual distributions from this investments until the projects closed, to only later deprive him of those distributions without justification;

(b) Stating that Plaintiff would receive his initial investment along with any gains after completion of the project, only to later give him less than his original investment without justification; and/or

(c) Representing that this was a serious investment endeavor when in actuality, among information and belief, it was a scheme aimed to deliberately defraud the Plaintiff of his investments.

134. The Plaintiff did not know of, or have reason to know of, and/or were unaware of the falsity of such material misrepresentations and omissions of material fact, with a duty to disclose, and relied upon them, to his detriment and in connection with the offer and/or sale of securities.

135. The Defendants knew or in the exercise of reasonable care should have known that they had made such material misrepresentations and omissions of material fact, with a duty to disclose, in the documents and statements pertaining to Projects III, IV, VII, and VIII investments.

136. The Defendants knew of the misrepresentations and omissions of material fact, with a duty to disclose, and cannot sustain the burden of proof that they did not know and in the exercise of reasonable care could not have known of such misrepresentations and omissions.

137. Defendants, including but not limited to Robert Burpee and Derek Del Simone, as Managers of Opuvize and Projects III, IV, VII, and VIII and owners of at least 66.66% voting power in all five (5) of the companies, are and were control persons of Opuvize and Projects III, IV, VII, and VIII, and materially aided in the sale of Projects III, IV, VII, and VIII securities and

cannot sustain the burden of proof that they did not know and in the exercise of reasonable care could not have known of such material misrepresentations and omissions of material fact, with a duty to disclose,

138. Defendants' activities in and their sale of the securities were material – indeed, essential: the Plaintiff relied upon his longstanding relationship with Mr. Burpee as a financial advisor and Mr. Burpee's representations that Mr. Del Simone was his trusted business partner in the other and purchase of the Projects III, IV, VII, and VIII securities.

139. As a direct and proximate cause of the violations of the Massachusetts securities laws and M.G.L. c. 110A by the Defendants, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to their detriment, and resulted in the unjust enrichment of the Defendants.

**COUNT IV – "CONTROL PERSON" LIABILITY PURSUANT**
**TO THE MASSACHUSETTS SECURITIES LAWS, M.G.L. c. 110A, § 410(b)**

140. The Plaintiff reallege Paragraphs 1 – 139, with **Exhibits**, and incorporate them herein by reference.

141. During the relevant time period and as set forth herein, the Defendants are, and were during the relevant time, "control persons" within the meaning of Section 410(b) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A.

142. Massachusetts General Laws, Chapter 110A, Section 410(b) provides, in pertinent part, as follows:

> "Every person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller,

> unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."

M.G.L. c.110A, § 410(b).

143. In addition to their direct liability, the Defendants are liable to the Plaintiff for the conduct of Projects III, IV, VII, and VIII Entities, as described herein, in that:

> a) at all times material hereto, Defendants controlled Projects III, IV, VII, and VIII Entities, which were subject to their supervision and/or control, respectively, directly or indirectly; and,
>
> b) at all times material hereto and with respect to all of the transactions and misrepresentations described herein, Projects III, IV, VII, and VIII, under the direct supervision and control of Defendants, committed acts, practices and/or courses of conduct which were in violation of their obligations under the federal securities laws and the standards of the securities industry.

144. The Defendants, jointly and severally, singly and in concert, directly and/or indirectly, benefitted from fees, profits, gains, interest, commissions and/or other monies, as derived from the conduct of such individual(s), as described herein.

145. As "control persons," the Defendants are liable for the false and fraudulent actions, practices, courses of conduct and/or omissions of those controlled persons committing a fraud and deceit in connection with the offer, purchase and/or sale of The Worcester Projects securities, at the time of the wrongs alleged herein and as set forth herein, within the meaning of Section 410(b) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A, as the Defendants had the supervision, power, authority, and influence over such controlled persons, and exercised the same as described herein.

146. The Defendants' control, authority, supervision and/or positions made them privy to and provided them with knowledge, actual and/or apparent, as to the material misrepresentations and the omissions of material facts, with a duty to disclose, as to the Plaintiff.

147. As a direct and proximate cause of the violations of the Massachusetts securities laws by the Defendants, Plaintiff have suffered, and continue to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to their detriment, and resulted in the unjust enrichment of the Defendants.

## COUNT V – FRAUD AND DECEIT

148. The Plaintiff realleges Paragraphs 1 – 147, with **Exhibits**, and incorporates them herein by reference.

149. The actions of the Defendants described herein constitute fraud and deceit, including but not limited to the following:

a) the Defendant made false representations of material facts, and/or omitted material facts with a duty of disclosure, knowing or having reason to know of their falsity;

b) the Defendant made misrepresentations and omissions for the purpose of inducing reliance from the Plaintiff; and,

c) the Plaintiff did rely upon said misrepresentations and omissions, to their detriment.

150. As described above, the Defendants knowingly and recklessly provided material misrepresentations and omissions of material fact, with a duty to disclose, to the Plaintiff in order to induce him to invest in Projects III, IV, VII, and VIII.

151. Such material misrepresentations and omissions of material fact, with a duty to disclose, provided to the Plaintiff included, but were not limited to, those set forth herein.

152. At the time of the transmittal of such misrepresentations and omissions of material fact, with a duty to disclose, the Defendants knew that such misrepresentations and omissions were false.

153. The Defendants' misrepresentations and omissions of material fact, with a duty to disclose were material to the Plaintiff' decisions to invest in Projects III, IV, VII, and VIII.

154. The Plaintiff were unaware, when they invested in Projects III, IV, VII, and VIII, of the falsity of the Defendants' misrepresentations and omissions.

155. The Defendants intended that the Plaintiff rely upon these false representations and promises.

156. The Plaintiff justifiably relied on the misrepresentations and misleading information caused by the omissions when they invested in The Worcester Projects.

157. The Plaintiff were injured by the Defendants' misrepresentations and omissions when their funds were misused and misdirected towards the payment of Projects III, IV, VII, and VIII.

158. As a direct and proximate cause of the Defendants' fraud and deceit, Plaintiff have suffered, and continue to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to their detriment, and resulted in the unjust enrichment of the Defendants.

## **COUNT VI – NEGLIGENT MISREPRESENTATION**

159. The Plaintiff reallege Paragraphs 1 – 158, with **Exhibits**, and incorporate them herein by reference.

160. The conduct of the Defendants as described herein constitutes negligent misrepresentation in that the Defendants negligently provided the Plaintiff with erroneous and misleading information, and negligently omitted material information, with a duty to disclose, to the Plaintiff' detriment.

161. The Defendants negligently and in breach of their duties to the Plaintiff made material misrepresentations and omissions of material fact, with a duty to disclose, and caused material misrepresentations and omissions of material fact, with a duty to disclose, to be made through various documents and statements pertaining to the Worcester Projects to induce the Plaintiff to invest in The Worcester Projects and to induce the Plaintiff to refrain from taking steps to withdraw or dispose of their investments in Projects III, IV, VII, and VIII.

162. The Defendants knew or should have known that these statements were false and misleading and that the Plaintiff would rely upon them when deciding to invest in The Worcester Projects.

163. Such material misrepresentations and omissions of material fact, with a duty tp disclose, provided to the Plaintiff included, but were not limited to, those set forth herein.

164. The Defendants failed to exercise reasonable care in evaluating the truth of their statements before providing the information to the Plaintiff, and in omitting such material information from the Plaintiff.

165. The Plaintiff had no knowledge that the Defendants' statements and omissions of material fact, with a duty to disclose, were false, and reasonably relied upon them when investing in The Worcester Projects.

166. Had the Plaintiff known that the Defendants' statements were untrue or known the material information that the Defendants did not disclose, the Plaintiff would not have invested in The Worcester Projects.

167. As a direct and proximate cause of the Defendants' negligent misrepresentations, the Plaintiff have suffered, and continue to suffer, irreparable harm, and general, special, and

consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to their detriment.

**COUNT VII – UNJUST ENRICHMENT**

168. The Plaintiffs reassert Paragraphs 1 through 167 above, and the Exhibits attached hereto, and incorporates them herein by reference.

169. The Defendants unlawfully used, interfered with, and obtained benefits from investments from the Plaintiff.

170. Defendants' actions, courses of conduct, and omissions were wantonly, intentionally, and maliciously conducted against the Plaintiff, to his detriment.

171. Defendants have been unjustly enriched by their actions as described herein:

(a) Plaintiff provided $1,715,500.00 in investment funds to Defendants for an investment in their real estate projects over the course of Projects III, IV, VII, and VIII.

(b) To date, Plaintiff is owed **$596,169.50** in unpaid annual returns and final distributions on these investments.

172. As a direct and proximate cause of the Defendants' unjust enrichment, the Plaintiff have suffered, and continue to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to his detriment.

**COUNT VIII – CONVERSION / MISAPPROPRIATION**

173. The Plaintiffs reassert Paragraphs 1 through 172 above, and the Exhibits attached hereto, and incorporates them herein by reference.

174. Defendants intentionally and wrongfully exercised acts of ownership, control, or dominion over the Plaintiff's investments to which they have no right of possession to because,

upon information and belief, all of the projects or at least two (2) of them have been completed and therefore Plaintiff is entitled to his distributions.

175. By deliberately refusing to provide Plaintiff with his full final distributions, Defendants have converted and misappropriated the funds of the Plaintiff, to his detriment and in breach of their duty to the Plaintiff.

176. As a direct and proximate cause of the Defendants' conversion / misappropriation, the Plaintiff have suffered, and continue to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to his detriment.

**COUNT IX – BREACH OF CONTRACT**

177. The Plaintiffs reassert Paragraphs 1 through 176 above, and the Exhibits attached hereto, and incorporates them herein by reference.

178. A breach of contract occurs when there is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract.

179. The Plaintiff entered into a contract with Projects III, IV, VII, and VIII.

180. In detrimental reliance upon those contracts, Plaintiff provided approximately $1,700,000.00 in investment funds.

181. Plaintiff performed his obligations under the contract and in good faith.

182. Defendants, by their conduct described herein, breached their implied contact with the Plaintiff when they stopped paying him the annual returns that he was owed and refused to distribute to him the amounts that he initially invested.

183. As a direct and proximate cause of the Defendants' breach of contract, the Plaintiff have suffered, and continue to suffer, irreparable harm, and general, special, and consequential

damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to his detriment.

## VII. REQUESTS FOR RELIEF

WHEREFORE, the Plaintiff, Raymond Blech, respectfully request that this Honorable Court grant him the following relief:

A) Order, grant and enter temporary, preliminary and permanent injunctive and equitable relief, attachment of real estate and attachment by the trustee process, and specific performance, and finding that the Plaintiff have suffered irreparable harm, has a likelihood of success on the merits, that the balance of hardships favors the Plaintiff, and that it is in the public interest to grant such temporary, preliminary and permanent injunctive and equitable relief, and specific performance for the benefit of the Plaintiff, as set forth herein;

B) Determine that the Defendants are liable for all damages, losses, and costs, as alleged herein;

C) Determine and award the Plaintiff the actual losses sustained by him as a result of the violations of law by the Defendants, as set forth herein;

D) Render a judgment and decision on behalf of the Plaintiff on all Counts of the Complaint, and issue findings of fact and rulings of law, as necessary and appropriate, that the Defendants are liable, in all respects;

E) Order, decide, adjudge, and determine that the liability of the Defendants is for all losses, injuries, and damages, special, consequential, general, punitive, and/or otherwise, and for all interest and costs, as alleged herein;

F) Award the Plaintiff his costs, including, but not limited to, filing fees, costs, expenses and interest, for being required to prosecute this action;

G) Award the Plaintiff his actual attorneys' fees, for being required to prosecute this action;

H) Award the Plaintiff multiple, double, treble, and/or punitive damages in an amount to be determined;

I) Enter judgment on behalf of the Plaintiff on the Complaint;

J) Order declaratory relief, as appropriate and as this Honorable Court deems necessary; and/or

K) Any additional relief which this Honorable Court deems just and proper.

**THE PLAINTIFF HEREBY DEMAND**
**A TRIAL BY JURY ON ALL COUNTS SO TRIABLE**

Respectfully Submitted,
PLAINTIFF, Raymond Blech,

By his Attorneys,

/s/ *Philip M. Giordano*
Philip M. Giordano, Esq. (BBO No. 193530)
Julian A. Frare, Esq. (BBO No. 713102)
Giordano & Company, P.C.
REED & GIORDANO, P.A.
177 State Street
One McKinley Square, 6th Floor
Boston, Massachusetts 02109-2724
Telephone: (617) 723-7755
Facsimile: (617) 723-7756
Email: pgiordano@reedgiordano.com
Email: jfrare@reedgiordano.com

Dated: October 9, 2026